IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal Action No. 3:05-CR-321-L |
| | § | |
| ROBERT LEE BERRY | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Robert Lee Berry's Motion to Suppress and Brief, filed April 3, 2006. The court held an evidentiary hearing on May 8, and May 17, 2006. At the hearing, the court heard testimony from the following witnesses on behalf of the Government: Corporal Mark Markulec, Officer Darien Loera, Officer Antonio Aleman, Agent Ashley Stephens, Officer Teena Schultz, Corporal Hector Roa, and Officer Mark Michaels. The following individuals testified on behalf of Defendant: Josh Vance, Emmitt Norris, Joe Saal, Shane Berry, and Pam Stater. After careful consideration of the legal briefing by the parties, testimony and evidence presented at the hearing, and applicable law, the court **grants** Defendant's Motion to Suppress.

## I.    Background Facts

On December 6, 2005, a federal grand jury indicted Defendant Robert Lee Berry ("Defendant" or "Berry") with being a felon in possession of firearms in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2), possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B)(viii), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), possession of an unregistered firearm in violation of 26 U.S.C. §§ 5845(a), 5861(d) and 5871, and possession of an unregistered firearm with an obliterated serial number in violation of 26 U.S.C. §§ 5845(a), 5861(d) and 5871. The

**Memorandum Opinion and Order – Page 1**

superseding indictment filed March 7, 2006 additionally charged Berry with conspiracy to manufacture, distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. § 846, possession of Gamma Hydroxybutyric Acid with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and further counts related to possession of unregistered firearms in violation of  26 U.S.C. §§ 5845(a), 5861(d) and 5871.

The indictment and superseding indictment arose from an incident that occurred on July 27, 2005, at Berry's residence at 406 Hartsdale, Dallas, Texas, involving, among others, the Gang Unit of the Dallas Police Department.  The parties offer conflicting accounts of the actual events of July 27, 2005 in their legal briefs and arguments.  Notably, the officers involved offer conflicting testimony.  The live testimony at the suppression hearing held on May 8 and May 17, 2006, as well as the exhibits admitted into evidence, establish the following facts.[1]

On or about July 24, 2005, officers from the Dallas Police Department ("DPD") Gang Unit were investigating narcotics and gang activity at an apartment building near the intersection of Davis Street and Hartsdale Drive in Dallas, Texas.  One of the investigating officers, Corporal Mark Markulec, testified he noticed suspicious vehicular and pedestrian traffic at an adjacent home located at 406 Hartsdale Drive ("406 Hartsdale").  The Gang Unit then conducted surveillance on 406 Hartsdale for the next few days.  During that period, Corporal Markulec testified that he pulled over one (1) suspicious vehicle during surveillance, and that the driver told him she had gone to 406

---

[1] The facts contained herein are either undisputed based upon the evidence admitted, or facts found by the court after considering the credibility or believability of each witness.  In making such credibility determinations, the court considered all of the circumstances under which the witness testified, which include: the relationship of the witness to Defendant Berry or the Government; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.

**Memorandum Opinion and Order – Page 2**

Hartsdale to purchase methamphetamine.  Corporal Markulec testified that no drugs were present on the driver, and that he was the only officer present at the stop.  Officer Aleman, Corporal Markulec's partner, provided a different account regarding the number of traffic stops made of cars leaving 406 Hartsdale.  Officer Aleman testified that he was with Corporal Markulec during the stops, that they had pulled over at least three (3) vehicles on July 26, 2005, and at least three (3) drivers indicated that drugs were being sold at 406 Hartsdale.  Officer Aleman also testified that more vehicles may have been stopped by other officers conducting surveillance.  Neither Corporal Markulec nor Officer Aleman recorded the drivers' names or vehicle identification information.

Corporal Markulec informed his sergeant, Sergeant John Madison, along with other officers in the Gang Unit, and some officers from "Operation Disruption"[2] about the investigation of 406 Hartsdale.  The officers decided to conduct a "knock and talk"[3] to investigate possible drug activity. Corporal Markulec testified that he did not believe he had enough evidence to obtain a search warrant at the time.  At some point on July 27, 2005, the officers gathered and had a meeting to plan the "knock and talk."  Officers provided inconsistent accounts about the location and specifics of the planning meeting.

Sometime after the meeting, Corporal Markulec, Sergeant Madison, Corporal Roa, Officer Aleman, Officer Loera, Officer Schultz, and Officer Michaels parked their vehicles away from Berry's residence.  Corporal Markulec, Sergeant Madison, Corporal Roa, Officer Aleman,  and Officer Schultz (hereinafter, the "front officers") approached the front of 406 Hartsdale from

---

[2] "Operation Disruption" is a special unit formed by the DPD Chief of Police that establishes a police presence in high-crime areas.

[3] Corporal Roa testified that a "knock and talk" is an investigative tool where DPD officers knock on a suspicious resident's door and attempt to get permission to enter and look for evidence of drug activity. Tr. at 419.  If the police find evidence of drugs, the officers will "write a memo to narcotics, and they will follow up on it."  *Id.*

Hartsdale Drive.  Officers Michaels and Miguel Almeida approached from a public alley behind 406

Hartsdale (hereinafter, the "rear officers").  Officer Loera approached from a side alley.

A.      **The Government's Version of the "Knock and Talk"**

According to the Government, Corporal Markulec, Corporal Roa, Officer Aleman, and

Sergeant Madison approached an open sliding glass door through an unlocked gate near the front

of 406 Hartsdale.  Officer Schultz watched the front of the house, but did not enter through the front

gate with the other officers.  Before those officers approached the door, Officer Loera entered the

backyard.  Officer Almeida and Officer Michaels observed the rear and side of 406 Hartsdale

outside the backyard fence from a side alley.  Corporal Markulec, Corporal Roa, and Officer Aleman

testified that they smelled a strong chemical odor at the front door consistent with the smell of a

methamphetamine lab, though no lab was ever found.

Corporal Markulec and Corporal Roa testified they could see occupants inside 406 Hartsdale

through the open door and loudly identified themselves as DPD officers.  After announcing their

presence, Corporal Markulec and Officer Aleman testified they heard the occupants inside yelling,

"it's the cops," followed by a commotion.  Officer Loera testified that Officer Michaels and Officer

Almeida in the side alley saw movement in the side window, and notified Officer Loera in the back

yard.  When Officer Loera approached the window, he saw a hand throw drugs out, and informed

the officers over the radio about his observation.  Front officers Corporal Markulec, Corporal Roa,

and Officer Aleman testified they immediately entered the home after they heard Officer Loera's

radio transmission about the drugs thrown out the window.

The front officers ran through the front door, detained two individuals in the front room, and

secured the rest of 406 Hartsdale with a "protective sweep."  As the front officers entered, a large

dog ran past Corporal Markulec, Officer Aleman, and Corporal Roa, and charged Sergeant Madison, who was standing near the entrance of the open door.  Sergeant Madison did not testify at the hearing.  Corporal Markulec stated that Sergeant Madison backed up and made an evasive effort, but eventually shot the dog outside in the front yard.  Upon hearing the shot, Officer Loera testified that the rear officers all entered the backyard, removed a window air conditioning unit from a side window, and pulled Berry and his wife Pam Stater out the window.  The front officers testified that, during their protective sweep, they found in plain view a number of guns, drugs, drug-making paraphernalia, and a large amount of cash in an open safe.

The officers sought permission to conduct a complete search of 406 Hartsdale from Berry, but he refused.  The officers testified that Berry's nephew, Shane Berry, signed a consent to search form.  The form purported to give officers permission to search the entire house, though the officers stated they chose not to perform a more thorough search on any part of the house.  Corporal Markulec testified that he then called Agent Stephens of the Bureau of Alcohol Tobacco and Firearms, because of the weapons in the home.  Agent Stephens arrived at the scene and testified that he catalogued weapons found in plain view.

As a result of the findings, Berry was indicted on drug and weapon charges, and an arrest warrant and search warrant were subsequently issued on December 13, 2005.  Berry was arrested at 406 Hartsdale on December 13, 2005, and the search turned up more drugs and weapons.

### B.     The Government's Version of the Events of July 27, 2005

According to the Government's version of the facts, in the course of investigating drug activity at a bar and apartment complex located near 406 Hartsdale, Dallas Police Officers noted foot and vehicular traffic at 406 Hartsdale, and were informed by an uncorroborated source that an older

white male in the residence had previously sold methamphetamine, but was not selling that particular day since police were in the vicinity.  The officers then conducted a "knock and talk" investigation at 406 Hartsdale.  The officers smelled ether and ammonia coming from inside the residence through an open sliding glass door, products associated with production of methamphetamine.  After loudly identifying themselves, they heard individuals yelling from inside, "it's the cops" and heard running.  A dog was released from the house and attacked one of the officers.  One officer shot the dog.

The officers at the rear of the house saw Berry drop out a rear window a clear baggie containing methamphetamine.  Berry and a woman with him were detained by the officers in the house.  After being radioed that drugs were being thrown out of the window, the officers at the rear of the house, unaware that Berry and a woman with him had already been detained, conducted a brief protective sweep for officer safety.  During the sweep, in Berry's bedroom, the officers observed loaded firearms and rounds of ammunition in plain view.  In an open safe, they discovered $11,615.  The officers also found two plastic baggies with methamphetamine on a desk and observed surveillance equipment and drug paraphernalia in the room.

Berry was arrested on December 13, 2005 pursuant to a warrant issued as a result of a federal indictment.  After police knocked and announced, Berry exited the house.  He went back into the house, the officers followed, and he was placed under arrest.  The officers engaged in another "protective sweep."  In plain view, once again, the officers saw drugs and guns.  A pat-down search of Berry revealed $4,390 in United States currency.  The officers subsequently obtained a search warrant from United States Magistrate Judge Paul D. Stickney and conducted a search of the residence and seized guns and drugs.  Although it was later determined that Magistrate Judge

Stickney did not sign the cover page of the December 13, 2005 search warrant application, he later corrected this problem.

### C. Inconsistencies in Officers' Testimonies

There are several inconsistencies in the factual record that, in the court's opinion, cast doubt on the Government's version of events. These inconsistencies include, among other things, the existence and timing of the radio communication that justified a warrantless entry into 406 Hartsdale.

Corporal Markulec, Corporal Roa, and Officer Aleman testified that they did not enter 406 Hartsdale until after they all heard a radio transmission from Officer Loera that drugs were being dropped out the back window (the "drug drop"). This radio transmission was these officers' only stated justification for entering the home without a warrant. Other officers, however, provide contradictory testimony. Officer Michaels and Officer Schultz both testified that they never heard any radio communication before the front officers entered the home and Sergeant Madison shot the dog. The court notes that Officer Schultz was not listed as a present officer in any of the police reports following the incident, nor was she even mentioned in the Government's Response to the Defendant's Motion to Suppress. The court did not learn of Officer Schultz's presence at 406 Hartsdale until the court noticed her name was listed on an internal affairs report generated regarding the dog shooting, which the Defense had not seen. The court further notes that Corporal Markulec, Corporal Roa, and Officer Aleman did not include any mention of the radio transmission in the internal affairs report about the incident.

Officer Loera testified that he made the radio transmission about the drug drop, but his testimony was inconsistent. Officer Loera testified that he could not see the side window at first

from his position in the back yard, but that he moved within sight of it after the officers in the alley shouted to him that someone had removed a towel from the window.  As he approached the window, he testified he saw a hand reach out and drop narcotics on the ground.  "For officer safety" he removed the air conditioning unit and threw it onto the ground to get a better view of the room.  Tr. at 67, ll. 14-23.

Officer Loera first testified he heard the sound of a gun "right after" the officers in the alley shouted to him about activity in the window.  Tr. at 84, ll. 24-25.  He then stated that he heard the shot "pretty much simultaneously" with seeing the drugs being dropped out the window.  Tr. at 84, ll. 1-3.  Officer Loera later testified that after seeing the drugs dropped, "we heard – got on the radio tried to notify them that narcotics were being thrown out the window, heard a gunshot."  Tr. at 93, ll. 18-20.  Officer Loera eventually stated that he definitely heard the shot after he made the transmission.

Other testimony casts doubt as to whether Officer Loera was even the officer who saw the drug drop.  One witness, Officer Michaels, whom the court found highly credible, testified that he was the officer who saw the drugs dropped, and he never made a radio transmission informing  the other officers of the drug drop.  Officer Michaels testified that after seeing the drug drop, he jumped the fence from the alley into Berry's backyard, approached the window, and shouted to the other rear officers regarding what he had seen.  Officer Michaels stated that he heard the gunshot as he approached the window, and that in response to the shot, he and Officer Loera removed the air conditioning unit together and pulled two suspects out from the back window.  Officer Michaels' statements further contradict Officer Loera's testimony that he alone had moved the air conditioner.

**Memorandum Opinion and Order – Page 8**

Corporal Roa's testimony also contradicts the Government's argument that the radio communication was made before the officers entered 406 Hartsdale. Corporal Roa testified that he heard the radio transmission, entered the house, felt the dog run past him, heard the shot, and then entered the empty back room during his protective sweep. He stated that it took fifteen seconds from the time he heard the transmission to the time he arrived in the *empty* back room. This was the same room from which Officer Loera and Officer Michaels pulled Berry and his wife out through the window, which was done in response to the gunshot. Corporal Roa's time frame would mean that Officer Loera and Officer Michaels would have had less than fifteen seconds to approach the back window, remove an air conditioner, instruct Berry and his wife to walk toward the window, and pull the two out, one at a time.

**D.      Civilian Testimony Conflicts With Police Testimony**

The testimony of civilian witnesses Emmitt Norris, Josh Vance, Shane Berry, and Pam Stater contradicts the Government's version of the "knock and talk." The testimony of the civilians was largely consistent, though each was in a different area in and around 406 Hartsdale on July 27. The civilian testimony specifically contradicts police testimony concerning the entry into 406 Hartsdale, the damage done to the house, the injuries to Berry, and the scope of the "protective sweep."

**1.      Emmitt Norris, Resident of 406 Hartsdale**

Emmitt Norris lived in the front room of 406 Hartsdale and was home at the time of the "knock and talk" on July 27. Mr. Norris testified that the first notice he had of the officers' presence was the sound of a gunshot. Mr. Norris next testified that when he poked his head out of his room to investigate the gunshot, an officer with a drawn gun told him to go back inside and close the door.

**Memorandum Opinion and Order – Page 9**

Mr. Norris stated he next heard the police kicking in the side door.  He testified that he later repaired the side door.

Officer Schultz, however, denied that this door was damaged, even though she stated she walked through it after the raid.  Officer Loera, Agent Stephens, Corporal Roa, and Officer Michaels testified either that the window and door were not damaged, or if they were, the officers were unaware of any damage.  Mr. Norris's testimony about having to repair a door indicates that the side door and window were broken during the raid.  Mr. Norris also testified that Berry's room was in "disarray" following the raid, and that the police had thoroughly searched it.  Tr. at 208, ll. 15-16.  This testimony is contradicted by Agent Stephens's testimony and that of several officers who testified that only a plain view search was made on July 27.  Lastly, Mr. Norris testified that no search or protective sweep of his room was ever made, even though he told the officers that he owned a pistol.  Corporal Roa testified that Mr. Norris assisted him in a plain view search of the room.

### 2.    Josh Vance, Neighbor of Defendant Berry

Josh Vance testified that he was across the street from 406 Hartsdale during the "knock and talk" and witnessed the entire event.  Mr. Vance stated that he first saw the officers approach 406 Hartsdale at a run, jump the backyard fence, and enter through a closed front gate.  There is conflicting police testimony as to whether this front gate was open or shut.  Officer Aleman and Corporal Roa testified that the front gate, which the officers had to walk through to access the front door, was hanging wide open.  Corporal Markulec and Officer Schultz, however, confirmed Mr. Vance's testimony that the officers had to open the gate before they approached the front door.

Mr. Vance also testified that he saw the dog run out the front door and get shot.  Like Mr. Norris, Mr. Vance stated that he did not hear the officers announce their presence until after the gunshot was fired.  Mr. Vance's testimony was also consistent with Mr. Norris's concerning the damage done to the side door and window.

Finally, Mr. Vance testified that when he saw Berry being brought out from the backyard, he noticed Berry was injured.  Officer Loera testified that he was unaware of the injury Berry sustained  when he was pulled out through the rear window, even though Officer Michaels stated that Officer Loera had helped pull Berry out through the window.  Officer Schultz also stated she was unsure whether Berry was injured, even though she knew at the raid that an ambulance unit was called to examine him.

### 3.    Shane Berry, Resident of 406 Hartsdale

Shane Berry was a resident of 406 Hartsdale during the "knock and talk" on July 27, and was sleeping on the couch in the living room when he first noticed the officers.  Shane Berry testified that he saw an officer standing partially inside the open sliding doors before the heard the officer announce his presence.  He stated that the officers then rushed in and apprehended him, after which he heard a gunshot.  After Shane Berry was apprehended, he testified that he was taken to the police station for questioning and returned home.

Shane Berry testified that when he returned, the house was a "total wreck" as a result of the raid, that drawers and cabinets were pulled open, bed sheets removed, and cereal boxes dumped out. Tr. at 365, ll. 15-25.  This testimony is consistent with Mr. Norris's and further indicates that a more thorough search was made than a protective sweep.  The officers repeatedly testified that they never

made a thorough search, even though they had a signed consent form from Shane Berry. Shane Berry denied that he ever signed the form, and stated that the signature on the form was not his.

Shane Berry's testimony was also consistent with Mr. Norris's and Mr. Vance's concerning the damage to the door and window, and concerning the front officers' entrance through a closed front gate. Shane Berry testified that the gate has a closing mechanism that prevents it from ever being left wide open, as Corporal Roa and Officer Aleman testified.

### 4. Pam Stater, Berry's Wife

Pam Stater is Berry's common law wife and was in the back room with him at the time the officers made entry into the house. Ms. Stater testified that she first noticed the police presence when she heard the gunshot, followed by the window being broken in and the sound of the officers announcing their presence. Her testimony confirms Mr. Norris's, Mr. Vance's and Shane Berry's concerning the damage to the side door and window, the injuries to Berry, and the damage to the house.

With respect to the conflicting testimony, the court recognizes that fast-moving events may lead to inconsistent testimony. Given the variety and frequency of the inconsistencies, however, the court has a difficult time accepting as credible the testimony of some of the officers.[4]

## II.     Defendant's Motion to Suppress

Berry seeks to suppress:

All evidence, including the Defendant's statements, if any, and all physical evidence and testimony, specifically including alleged narcotics, currency and firearms or other matters relating to any evidence obtained or observed as a result of a

---

[4] The court is not concluding that the officers deliberately made false statements; the court fully realizes that there was the passage of time between the events that took place in July 2005 and the testimony provided at the hearing in May 2006, and their recollections are not as good as they were ten months earlier, but faulty memory or recollection definitely affects credibility.

**Memorandum Opinion and Order – Page 12**

> warrantless search of a residence, outbuildings, and vehicles in Dallas, Texas which occurred on or about July 27, 2005 and the subsequent  warrantless search of the same residence while the defendant was in custody.

Mot. to Suppress at 1.

Berry alleges the officers searched his residence at 406 Hartsdale without a warrant and without consent, even though they had adequate time to procure a warrant, and that there were insufficient exigent circumstances. *Id*. at 2. According to Berry, this search violated his reasonable expectation of privacy in his residence in violation of the Fourth Amendment. *Id* at 4. He further contends that he was arrested and subject to custodial interrogation and that, although he was warned of his rights, this was insufficient to attenuate the taint of the prior illegal search and arrest. *Id*. at 2.

> Berry also seeks to suppress:

> All evidence, including the Defendant's statements, if any, and all physical evidence and testimony, specifically including alleged narcotics, currency and firearms or other matters relating to any evidence obtained or observed as a result of a search of a residence, outbuildings, and vehicles in Dallas, Texas which occurred on or about December 13, 2005 and the subsequent search of the same residence while the defendant was in custody.

Mot. to Suppress at 1.

While arresting Berry pursuant to an arrest warrant, the officers performed a "protective sweep" and reportedly observed evidence of narcotics and firearms. *Id*. at 2-3. Thereafter, the officers sought and obtained a search warrant signed by Magistrate Judge Stickney, authorizing them to seize the items observed during the "protective sweep," and to conduct additional searches. *Id*. at 3. Although the affidavit and the warrant were signed, the warrant application was not signed or sworn to before the Magistrate Judge on December 13, 2005 and the Magistrate Judge did not sign the application for the warrant. *Id*.

**Memorandum Opinion and Order – Page 13**

With respect to the July 27, 2005 warrantless search of Berry's home, the Government contends that the officers conducted a lawful "knock and talk," approaching the home to identify the occupants because they suspected that drugs were being sold from the house. Govt's Post-Hearing Brief at 5-7. The Government contended initially that the consent given by Shane Berry justified the officers' entry into the home. Govt's Resp. to Suppression Mot. at 3. The Government has abandoned this argument, and now asserts that the officers' entry was justified by exigent circumstances. Govt's Post-Hearing Brief at 7-8. Exigent circumstances existed because of Berry's attempt to destroy evidence, the officers' intent to place him under arrest, and the danger to the officers and the community posed by the chemicals contained within Berry's house. *Id*. The Government also contends that Berry, and not the officers, caused the exigency that justified the officers' entry. *Id*. at 9-11. Additionally, the Government asserts that the officers conducted a limited "protective sweep" to assure officer safety, and that the contraband and evidence found in plain view is admissible against Berry at trial. *Id*. at 11.

Finally, the Government contends that all of the additional evidence recovered on December 13, 2005 was validly obtained, and not the "fruit of the poisonous tree." Govt's Resp. to Suppression Mot. at 4-5. The technical failure of the Magistrate Judge and Special Agent Stephens to sign the application page of the search warrant does not require the suppression of any evidence due to a good faith exception. Govt's Post-Hearing Brief at 11-12. The Government contends that the police officers had a valid arrest warrant and only followed Berry back inside his home when he fled. Once inside, the police were authorized to conduct a "protective sweep." Govt's Resp. to Suppression Mot. at 4-5.

### III.     Analysis

The Fourth Amendment protects people in their homes from unreasonable searches and seizures, and requires probable cause to obtain a warrant either to arrest a suspect in his home or to search the home.[5]  *United States v. Richard*, 994 F.2d 244, 247 (5ᵗʰ Cir. 1993).  Warrantless searches and seizures inside a person's home are presumptively unreasonable under the Fourth Amendment. *Id*.  The presumption of unreasonableness may be rebutted where the occupant gives valid consent to conduct the search, or probable cause and exigent circumstances exist to justify the intrusion. *United States v. Jones*, 239 F.3d 716, 719 (5ᵗʰ Cir.), *cert. denied*, 534 U.S. 861 (2001); *United States v. Richard,* 994 F.2d at 247.

Exigent circumstances include those in which officers reasonably fear for their safety, where firearms are present, or whether there is a risk of a criminal suspect's escaping or fear of destruction of evidence.  *United States v. Rico*, 51 F.3d 495, 501 (5ᵗʰ Cir.), *cert. denied*, 516 U.S. 883 (1995); *United States v. Hicks*, 389 F.3d 514, 527 (5ᵗʰ Cir. 2004), *cert. denied*, ___ U.S. ___ (2006).  The asserted exigent circumstances may not consist of the likely consequences of the officers' own actions or inaction.  *United States v. Vega*, 221 F.3d 789, 798-99 (5ᵗʰ Cir. 2000), *cert. denied*, 531 U.S. 1155 (2001).  The Government has the burden of establishing probable cause and exigent circumstances to excuse a warrantless search.  *United States v. Berick*, 710 F.2d 1035, 1037 (5ᵗʰ Cir.), *cert. denied*, 464 U.S. 918 (1983).

---

[5]  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

**Memorandum Opinion and Order – Page 15**

A.        **The July 27, 2005 Warrantless Search**

As noted above, Berry asserts that the officers searched his home without a warrant and without consent, even though they had adequate time to procure a warrant, and there were no exigent circumstances. The Government responds that the officers conduced a lawful "knock and talk," and the officers' entry was justified by exigent circumstances.

1.        **The "Knock and Talk"**

Corporal Markulec testified that he did not believe that he had probable cause to make an arrest or to obtain a search warrant before the officers approached Berry's home on July 27, 2005. Tr. at 21, ll. 16-22. Courts have recognized the "knock and talk" strategy, a noncustodial procedure whereby an officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence, as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001); *see also United States v. Zertuche-Tobias*, 953 F. Supp. 803, 829 (S.D. Tex. 1996).

The court does not find credible the testimony that the entry onto Berry's property was merely for the purpose of a permissible "knock and talk." The court determines that the conduct of the officers, who knew they lacked probable cause, reflects a plan or effort to arrest Berry without getting a warrant. The totality of the circumstances suggest a major operation. There were at least eight officers present. The officers carefully planned the operation, staked out their positions surrounding Berry's house, and took cover positions. Four officers entered Berry's patio and approached the front door. This is overkill for the stated purpose of a "knock and talk." *See United States v. Jones*, 239 F.3d at 720 (reasonable suspicion of criminal activity cannot justify the

warrantless search of a house).  Moreover, the inconsistency in the testimony of several of the officers casts much doubt as to the stated purpose of a "knock and talk."

Berry contends, and the Government now acknowledges, that he never consented to the search of his home on July 27, 2005.  The Government has abandoned the argument that Shane Berry could consent to the search of Berry's house over Berry's protest.  *See Georgia v. Randolph*, __ U.S. ___, 126 S.Ct. 1515, 1526 (2006) (the warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident).  The legality of the search thus turns on whether there were exigent circumstances not resulting from the officers' own actions.

### 2.     Exigent Circumstances

The Government asserts the officers' entry was justified due to these exigencies:  Berry's attempt to destroy evidence, the officers' intent to place him under arrest, and the danger to the officers and the community posed by the chemicals contained within the residence.  Govt's Post-Hearing Brief at 7-8.  The Government also asserts that the officers did not manufacture exigency. *Id*. at 8-10.  These arguments, however, are based on the testimony of certain officers that does not square with that of other officers on the scene; nor does it square with the testimony of percipient witnesses called by the defense.

Corporal Markulec testified that he entered Berry's house after Officer Loera notified the officers over the police radio that "someone is throwing drugs out the rear window."  Tr. at 25, l. 10-21.  After the officers entered the house, a large German shepherd ran past him, Corporal Roa, and Officer Aleman and attacked Sergeant Madison in the doorway.  Corporal Markulec further testified that Sergeant Madison retreated and backed up to a fence where he shot the dog once as the

**Memorandum Opinion and Order – Page 17**

dog attacked him.  *Id.*  According to this testimony, the officers were in the house for at least a brief period of time *before* the gunshot.

Officer Loera, who was in the backyard of Berry's house as the front officers approached, testified that the officers in the alley at the back of the house alerted him to activity visible from a back window, and he moved toward the window from the side of the house.  He testified that he heard the gunshot "right after" the officers in the alley notified him of the activity in the window, while he was approaching the back of the house, "pretty much simultaneously" when he saw something thrown out of the window.[6]  Tr. at 84, l. 12 - 85, l. 3.  Officer Loera testified he saw a hand throw drugs out of a window, and he then informed the other officers by radio about this observation.  Tr. at 85, ll. 21-23.  On redirect examination, Officer Loera then testified that some time *after* his radio report is when he heard the gunshot.  Tr. at 94, ll. 21-23.

In addition to Corporal Markulec, front officers Corporal Roa and Officer Aleman testified they immediately entered the house after they heard Officer Loera's radio transmission about the drugs thrown out the window.  The radio transmission was these officers' only stated justification for entering the house without a warrant.  Officer Michaels and Officer Schultz, however, both testified that they never heard any radio communication before the front officers entered Berry's house and Sergeant Madison shot the dog.  Officer Michaels testified that he was the officer who saw the drugs dropped, and he shouted the information to the other rear officers, but never made a

---

[6] Officer Loera first testified that the saw an arm throw out the window "a clear sandwich bag that contained a crystal-like substance, looked like to be methamphetamine or ice." Tr. at 67, ll. 6-8.  He later testified that "once I got close enough to see it was narcotics," he removed the air conditioner from the window.  Tr. at 93, ll. 18-22.

Officer Michaels testified that he saw an individual reach out and drop "a baggie which contained a white substance which I believed to be crystal methamphetamine."  Tr. at 453, ll. 19-22.  Officer Michaels testified that he assumed the substance was methamphetamine because the officers were investigating a complaint consistent with methamphetamine and it was contained in a manner consistent with how methamphetamine is sold before it is individually packaged.  Tr. at 461, l. 21 - 462, l. 14.

**Memorandum Opinion and Order – Page 18**

radio transmission.  Additionally, Corporal Markulec, Corporal Roa, and Officer Aleman did not include any mention of the radio transmission – the sole justification for their warrantless entry – in the internal affairs report about the incident.  The court finds that the conflicting testimony constitutes insufficient evidence that exigent circumstances preceded the officers' warrantless entry into Berry's house.

The court also finds that the officers' suspicions about the presence of a methamphetamine lab do not constitute sufficient exigent circumstances for the officers' entry.  Without reason to believe that a criminal suspect is aware of police surveillance, "the mere presence of firearms or destructible, incriminating evidence does not create exigent circumstances."[7]  *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986).  Corporal Markulec testified that he detected a strong odor "like strong cat urine, ammonia, and ether coming from inside," and that it "possibly indicates there could be a meth lab inside."  Tr. at 24, ll. 3-14.  He testified that he did not believe he had probable cause to enter because of the odor, because it could have been cat urine.  Tr. at 51, ll. 3-13.  Corporal Markulec testified that they found no meth lab or ether in Berry's house.  Tr. at 49, ll. 18-21.

---

[7]  While there was some evidence that Berry was aware of police surveillance, the testimony was conflicting. Corporal Markulec testified that he had Berry's house under surveillance for three or four days prior to July 27, 2005, but wrote no reports about it.  Tr. at 40, ll. 1-6.  He made one traffic stop of a female on July 26, 2005.  He interviewed the woman, who said she was at 406 Hartsdale to purchase methamphetamine from an older white male, but he would not sell to her because the police were outside watching.  Corporal Markulec found no drugs on her.  Tr. at 19, l. 24 - 20, l. 12 and 45, ll. 7-13.  Corporal Markulec did not try to get a warrant, testifying that he did not "believe there would have been a judge that would have signed that just based upon what one woman is saying with no evidence."  Tr. at 57, ll. 16-19.

Corporal Markulec's partner Officer Aleman testified that he made at least three traffic stops, and the people told him that drugs were being sold out of the house at 406 Hartsdale.  There is no report of these incidents, as Officer Aleman did not put the information in writing.  Tr. at 119, l. 11 - 120, l. 19.  He did not take any statements from these people.  Tr. at 121, ll. 22-24.  None had any drugs on them.  Tr. at 121, ll. 17-21.  Officer Aleman also testified that when he stopped these individuals, Corporal Markulec was with him on all three occasions, throughout the night.  Tr. at 147, l. 22 - 148, l. 8

Because of the lack of corroborating evidence, the court is reluctant to conclude that Berry was, in fact, aware of police surveillance.

**Memorandum Opinion and Order – Page 19**

In summary, upon a review of all the evidence, determination of the credibility of the witnesses, and consideration of the totality of the circumstances, the court finds that the government has failed to show that exigent circumstances preceded the officers' entry into Berry's house. The court determines that the officers in this case violated Berry's constitutional right to be free from warrantless searches and seizures inside his home. Otherwise stated, the Government has failed to rebut the presumption that the warrantless entry and search of Berry's home was unreasonable under the Fourth Amendment.

### 3.      Protective Sweep

The court must also address the "protective sweep" conducted by law enforcement officials. Berry contends that the protective sweep was actually a warrantless search of his home without consent or the presence of exigent circumstances. The Government contends that all the evidence was discovered in plain view during the protective sweep, and that the sweep was necessary due to exigent circumstances. By definition, "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie,* 494 U.S. 325, 327 (1990); *United States v. Gould*, 364 F.3d 578, 581 (5th Cir.) (en banc), *cert. denied*, 543 U.S. 955 (2004). Typically, when conducting a protective sweep of the premises, law enforcement officers enter the house, make a cursory inspection of those spaces where a person could be found, and then come back outside.

The testimony regarding the protective sweep is inconsistent and does not square with the permissible parameters of a protective sweep outlined above. Corporal Markulec testified that while he was in the front living room, Officer Aleman and Corporal Roa conducted a brief protective

sweep in about five minutes, and  neither he nor anyone else to his knowledge opened drawers or went through files or entered anywhere other than the brief protective sweep.  Tr. at 27, ll. 1-23 and 30, ll. 8-11.  Corporal Roa's testimony indicates that Corporal Markulec and Officer Aleman were with him when he made the protective sweep.  Tr. at 415, l. 7 - 416, l. 9.  Agent Stephens's report indicates that Corporal Markulec told him that Corporal Markulec searched Berry's back bedroom based on the written consent of Shane Berry.  Tr. at 102, ll. 2-18.  Agent Stephens conceded that he did not think Shane Berry had the power to consent to a search of the entire house.  Tr. at 183, ll. 3-5.

The residents of the house testified that the house was ransacked.  Shane Berry described it as a "total wreck."  Tr. at 365, ll. 14-15.

> In the living room where I was asleep on the couch up under the t.v. all the cabinet doors were opened up, all the movie tapes and stuff were thrown out.  My room had drawers pulled open, briefly gone through, sheets pulled off the bed.  And then in my uncle's room there was cereal boxes emptied out, candy bar boxes were emptied out, the bed was turned over.  Drawers gone through, cabinets – clothes were pulled out. Glass broke.

Tr. at 365, ll. 17-25.  Pam Stater testified that she did not return to the house until after Shane Berry had cleaned it up somewhat, "but it was destroyed, absolutely destroyed."  Tr. at 394, ll. 4-8.  The photographs of the kitchen door of Berry's house introduced at the hearing substantiate the testimony of Shane Berry and Emmitt Norris that this door was violently kicked in and broken.

Emmitt Norris testified that Berry's room was "in disarray.  They really went through his room," and "the room was just in shambles."  Tr. at 208, ll. 14-16 and 209, l. 3.  He also testified that the police officers were there for *seven or eight hours* on July 27, 2005.  Tr. at 206, ll. 19-25. Mr. Norris also testified that the police did not search his room, but merely looked in from the

doorway although he told them he had a pistol, and they did not look in his bathroom at all.  Tr. at 206, ll. 2-15.

Berry contends that any evidence seized as a result of the protective sweep are fruits of the poisonous tree.  Under the fruit of the poisonous tree doctrine, all evidence derived from an illegal search must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the constitutional violation.  *United States v. Jenson*, 462 F.3d 399, 408 (5th Cir. 2006).  No such break in the chain of events exists here.

Having concluded that the initial entry into the house was unlawful, the court further determines that the protective sweep (including any more comprehensive search euphemistically referred to as a "protective sweep") was unlawful.  Thus, any evidence seized as a result of these unlawful activities is fruit of a poisonous tree, and must be suppressed.  Accordingly, the motion to suppress all evidence obtained after the warrantless entry into Berry's house on July 27, 2005 will be granted.

### B.      The December 13, 2005 Arrest and Search

Berry seeks to suppress all evidence, including his statements, narcotics, currency and firearms, relating to a search incident to his arrest on December 13, 2005.  The search followed the issuance of an arrest warrant based on an indictment that was based on the information obtained in the search and arrest conducted on July 27, 2005.  The Government asserts that the technical failure of Magistrate Judge Stickney and Special Agent Stephens to sign the application page of the search warrant does not require the suppression of any evidence.  The Government invokes the good faith exception from *United States v. Leon*, 468 U.S. 897 (1984), arguing that the exception applies to

officers who rely on a warrant that was technically issued in violation of the law if the affidavit relied upon contained specific information regarding the object of the search, there was a probable cause determination, and the warrant could easily be validated by a minor correction.  Govt's Post-Hearing Brief at 11-12.

### A.      The Exclusionary Rule And Its Good Faith Exception

The Fourth Amendment to the United States Constitution provides that, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."  The Fourth Amendment requires that police obtain a warrant from a neutral and detached magistrate before embarking upon a search. *See Frank v. Delaware*, 438 U.S. 154, 164 (1978).  Any evidence seized in contravention of the Fourth Amendment is to be excluded in a criminal proceedings against the victim of the violation. *United States v. Cavazos,* 288 F.3d 706, 709 (5th Cir.), *cert. denied*, 537 U.S. 910 (2002) (and cases cited therein).  Under the good faith exception to the exclusionary rule, "where probable cause for a search warrant is founded on incorrect information, but the officer's reliance upon the information's truth was objectively reasonable, the evidence obtained from the search will not be excluded." *Id.*, 288 F.3d at 709, *citing United States v. Leon*, 468 U.S. 897, 919-20 (1984).

### B.      The Good Faith Exception Does Not Apply in This Case

According to Berry, even the good faith exception set forth in *United States v. Leon* does not dissipate the tainted arrest warrant based on information obtained pursuant to what Berry contends was the unlawful search and arrest on July 27, 2005.  Berry also argues that the search warrant does not justify the search because the search was also based on the fruit of the original illegal search. The Government contends that the good faith exception applies, primarily focusing on the technical errors in the warrant application.  *See United States v. Kelley*, 140 U.S. 596, 602-03 (5th Cir. 1998)

(exclusionary rule applied where the magistrate judge failed to sign the search warrant because probable cause existed and the warrant was flawed only due to the inadvertence of the magistrate).

The court concludes that the good faith exception does not apply in this case, because the search warrant affidavit was tainted by evidence that was itself obtained in violation of the Fourth Amendment.  Here, the Government is attempting to use the good faith exception in *United States v. Leon after the fact* to justify the admission of evidence ultimately obtained through an initial warrantless and unlawful search on July 27, 2005, a circumstance not contemplated by the Supreme Court in *Leon*.  If the court were to apply the good faith exception here, any police misconduct relating to a warrantless search under the circumstances presented by this case could be excused, which would make a mockery of the Fourth Amendment.

The original search on July 27, 2005 was unconstitutional and unlawful.  A search warrant issued on the basis of evidence from the unlawful search is likewise unlawful, and that evidence must be suppressed.  Having found no Fifth Circuit precedent precisely on point, the court agrees with the reasoning in *United States v. Reilly*, 76 F.3d 1271, 1280-81 (2$^d$ Cir. 1996), which declined to apply the good faith exception to the exclusionary rule and affirmed suppression of evidence because the issuance of a search warrant was itself premised on material obtained in a prior search that was illegal.  *See also United States v. Wanless*, 882 F.2d 1459, 1466-67 (9th Cir. 1989) (same); *compare United States v. Payne*, 341 F.3d 393, 402 (5th Cir. 2003) (because the first search of the defendant's home was valid, the second warrant prompted by weapons observed during the first search was likewise valid).

**Memorandum Opinion and Order – Page 24**

## IV.     Conclusion

For the reasons stated herein, the court **concludes** that no exigent circumstances were present in this case, and the warrantless entry into Berry's home on July 27, 2005 was therefore unconstitutional.  Accordingly, the court **grants** Defendant's Motion to Suppress.  The Government **shall not be permitted to use** at trial "all evidence, including the Defendant's statements, if any, and all physical evidence and testimony, specifically including alleged narcotics, currency and firearms or other matters relating to any evidence obtained or observed as a result of a warrantless search of a residence, outbuildings, and vehicles in Dallas, Texas which occurred on or about July 27, 2005 and the subsequent  warrantless search of the same residence while the defendant was in custody," and **"**all evidence, including the Defendant's statements, if any, and all physical evidence and testimony, specifically including alleged narcotics, currency and firearms or other matters relating to any evidence obtained or observed as a result of a search of a residence, outbuildings, and vehicles in Dallas, Texas which occurred on or about December 13, 2005 and the subsequent search of the same residence while the defendant was in custody."[8]

**It is so ordered** this 21st day of December, 2006.

*Sam A. Lindsay*

Sam A. Lindsay
United States District Judge

---

[8] This order does not suppress any voluntary declaration made by Berry or independently discovered evidence which falls under the parameters set forth in *United States v. Jones*, 239 F.3d 716, 722 (5th Cir. 2001).

**Memorandum Opinion and Order – Page 25**